UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SHAWN MICHAEL WALTHER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  Case No. 4:17-CV-2705-SPM |
| YONAS HABTEMARIAM, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This mater is before the Court following an evidentiary hearing on the question of whether Plaintiff failed to exhaust his available administrative remedies before filing the instant action, as required by the Prison Litigation Reform Act of 1996, 42 U.S.C. § 1997(e) (the "PLRA"). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 21). As set forth below, I find that Plaintiff has not exhausted his administrative remedies as to the claims before the Court in this action, and thus his claims must be dismissed.

**I.   BACKGROUND**

Plaintiff filed the instant action against several defendants under 42 U.S.C. § 1983, alleging claims of excessive force related to incidents that occurred while he was a pretrial detainee at the St. Louis County Justice Center (the "Justice Center"). Following initial review, Plaintiff was permitted to proceed on his claims that four defendants—Hellaryce Reed, William Trachsel, Yonas Habtemariam, and Christi Gonzalez—used excessive force against him during an incident on or around June 11 or June 12, 2017. Specifically, in Plaintiff's trial brief, Plaintiff asserts that Defendant Reed pepper sprayed him even though Plaintiff was only passively resisting commands,

1

a violation of policy; that Defendant Trachsel tased him; that Defendant Habtemariam stomped on him in his cell; that Defendants Reed and Habtemariam punched and elbowed him while dragging him to a restraint chair; and that the defendant officers left him in the restraint chair for several hours. He also asserts that after he told Defendant Nurse Gonzalez that his handcuffs were too tight, she tightened them further, causing bleeding and numbness.

In Defendants' trial briefs, Defendants argued that Plaintiff's claims should be dismissed because Plaintiff failed to exhaust his available administrative remedies before filing the instant action, as required by the PLRA. On June 10, 2022, the Court held a status conference to discuss this issue, and counsel for all parties agreed that the threshold question of whether Plaintiff exhausted administrative remedies should be decided by the Court in advance of trial. The Court vacated the trial date and held an evidentiary hearing on the exhaustion issue on June 28, 2022. At the hearing, Defendants presented testimony and documentary evidence to support their position that Plaintiff did not exhaust available administrative remedies, and Plaintiff presented testimony and documentary evidence to support his position that he made several attempts to do so but was thwarted by staff members. On July 13, 2022, the parties submitted post-hearing briefs in support of their positions.

## II. LEGAL STANDARDS

Under the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) "There is no

question that exhaustion is mandatory under [§1997e(a)] and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). If the Court determines that claims are unexhausted, they must be dismissed without prejudice. *Barbee v. Corr. Med. Servs.,* 394 F. App'x 337, 338 (8th Cir. 2010) (citing *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003), & *Lyon v. Vande Krol,* 305 F.3d 806, 807, 809 (8th Cir. 2002)).

The PLRA's exhaustion requirement "hinges on the 'availab[ility]' of administrative remedies," and an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). "The Supreme Court recognizes at least three circumstances where an administrative remedy is 'not capable of use' and thus unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide *any* relief to aggrieved inmates,' (2) where the 'administrative scheme' is 'so opaque' as to be practically 'incapable of use,' and (3) where "administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Muhammed v. Mayfield*, 933 F.3d 993, 1000 (8th Cir. 2019) (quoting *Ross*, 578 U.S. at 643-44)). *See also Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) (inmates are excused from complying with an institution's grievance procedures "when officials have prevented prisoners from utilizing the procedures," or "when officials themselves have failed to comply with the grievance procedures").

"Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing *Jones*, 549 U.S. at 211-12). If a defendant carries its burden of proving "that there was an available administrative remedy and the prisoner did not exhaust that remedy," then "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to

3

him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014). "[T]he ultimate burden of proof remains with the defendant." *Id.* See also *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011) ("Defendants . . . bear the burden of asserting and proving that the plaintiff did not utilize administrative remedies. Once a defendant proves that a plaintiff failed to exhaust, however, the onus falls on the plaintiff to show that remedies were unavailable to him as a result of intimidation by prison officials.") (internal citations omitted).

"[T]he Eighth Circuit has not addressed the issue of whether the court or a jury should decide questions of material fact concerning compliance with the duty to exhaust." *Covington v. Stuckey-Parchmo*n, No. 4:18-CV-01667-SEP, 2021 WL 3856554, at *2 (E.D. Mo. Aug. 27, 2021). However, "other circuits have held that such disputed material questions should be decided by the court." *Id.* (citing *Small v. Camden Cnty.*, 728 F.3d 265, 271 (3d. Cir. 2013), & *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008), as amended on denial of reh'g and reh'g en banc (Sept. 12, 2008)). *See also Small*, 728 F.3d at 271 (collecting cases and stating, "we agree with the Second, Fifth, Seventh, Ninth, and Eleventh Circuits and hold that judges may resolve factual disputes relevant to the exhaustion issue without the participate of a jury"); *Messa v. Goord,* 652 F.3d 305, 308 (2d. Cir. 2011) (holding that there is no right to a jury trial on factual disputes regarding an inmate's failure to exhaust administrative remedies as required by the PLRA); *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010) ("Since exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, we conclude that judges may resolve factual disputes concerning exhaustion without the participation of a jury."). This Court finds the reasoning of the above courts persuasive, and thus will determine whether Plaintiff has exhausted administrative remedies without a jury, based on consideration of the evidence presented at the evidentiary hearing. *See, e.g., Covington*, 2021 WL 3856554, at *4-

4

*6 (considering documentary evidence and testimony, making credibility determinations, and deciding whether the plaintiff had exhausted his administrative remedies).

### III. EVIDENCE PRESENTED AT THE HEARING

#### A. St. Louis County Justice Center's Grievance Procedure

At the evidentiary hearing, Defendants presented the St. Louis County Department of Justice Services Inmate Handbook (the "Handbook"), which sets forth the procedures by which inmates may file grievances. Def. Gonzales's Ex. 1, Doc. 116-1, at 18. Inmates who have a complaint concerning an incident, policy, or condition at the Justice Center are directed to request an inmate grievance form from the Housing Unit Officer and/or Unit Case Manager, complete the form, and submit the grievance to the Unit Case Manager or Housing Unit Supervisor. *Id.* at 18-19. The grievance must be filed within five days from the date of the incident at issue, unless circumstances make it unreasonable to file within that time. *Id.* at 18. The inmate will receive a written response to the grievance within five days of its receipt, or will be advised if the response will take longer. *Id.* at 19. A grievance appeal should be submitted to the Unit Caseworker and/or the Housing Unit Supervisor within three working days. *Id.* at 19.

Defendants also presented the testimony of Defendant Jeffrey Siler, the eighth floor unit manager at the Justice Center during the relevant time frame, regarding how he handled grievances. Def. Gonzalez's Ex. 4, Transcript of Evidentiary Hearing ("Hrg. Tr."), Doc. 116-3 at 11. Mr. Siler testified that in practice, inmates could ask for a grievance form from any staff member and could hand in a written grievance to any staff member. *Id.* at 18-20. After a staff member received a grievance, the staff member placed the grievance in a mailbox hanging on a wall outside Mr. Siler's office door. *Id.* at 19-20. The mailbox was not locked, and there was no procedure in place to prevent anyone from taking anything out of the mailbox. *Id.* at 38. After grievances were placed

5

in the mailbox, Mr. Siler entered each grievance into the computer by typing a synopsis of the grievance. *Id.* at 20. When possible, he provided an answer to the grievance; when necessary, he forwarded the grievance to the appropriate personnel to handle, and they returned responses to him for entry into the computer. *Id.* at 20-21. Mr. Siler also testified that even if he received a grievance outside of the five-day period described in the Handbook, he would process the grievance. *Id.* at 25-26. When the response was complete, Mr. Siler gave a computer printout of the response to a staff member to give to the inmate, along with a copy of the original grievance. *Id.* at 22. Mr. Siler testified that if an inmate disagrees with the response, the inmate can file a grievance appeal. *Id.* at 22. However, a detainee could not appeal his grievance if he did not receive a response. *Id.* at 39.

### B. Evidence Related to Grievances Filed by Plaintiff

Plaintiff testified that he was given a copy of the Handbook when he became an inmate at the Justice Center, that he read it numerous times to learn the grievance procedure, and that he understood the grievance procedure *Id.* at 60-61. He testified that he requested grievance forms from time to time while at the Justice Center, including from people other than the Housing Unit Officer or Unit Case Manager. *Id.* at 62. He also wrote out grievances on other pieces of paper from time to time. *Id.* With respect to the grievances he filed that were not related to the June 2017 issues, he received written responses. *Id.* at 72.

Plaintiff testified that he submitted three written grievances related to the June 2017 incident at issue in this case. First, he testified that a couple of days after the incident, he obtained a grievance form from a caseworker, Ms. Stearns. *Id.* She asked Plaintiff if he wanted to file a grievance because of the incident and then gave him a blank grievance form and a pencil. *Id.* at 63-64. He filled out the form, and he gave the form to Ms. Stearns. *Id.* Some time later, she told

6

him she had turned it in. *Id.* at 65. However, he never received a response to the first grievance. *Id.* Plaintiff testified that a couple of weeks later, he wrote a second grievance related to the incident on the blank side of a piece of paper. *Id.* at 66-67. He handed that paper to Officer Showmaker, who read it and then left carrying it. *Id.* at 68. Plaintiff testified that after that, Lieutenant Reed came down with a folded piece of paper, opened it up, and said, "You think anybody cares about this" and then ripped it up and threw it down. *Id.* at 66, 69. He wanted to get the pieces of paper and waited for his one-hour walk so he could come out and get them; however, before then, a porter swept them up and threw them in the trash. *Id.* at 69-70. Plaintiff looked for the pieces in the trash, but they were gone. *Id.* at 70. He never received a written response to the second grievance. *Id.* at 70. About a week later, he submitted a third grievance to a female employee with red hair. *Id.* at 70-71. He did not receive a response to the third grievance. *Id.* at 71-72.

Plaintiff acknowledged at the hearing that his testimony related to the paper Lieutenant Reed tore up differed somewhat from his deposition testimony. *Id.* at 83-87. He acknowledged that although he testified at the hearing that Lieutenant Reed tore up the paper after Plaintiff submitted the second grievance to Showmaker, he testified at his deposition testimony that the incident with Reed tearing up the paper occurred after Plaintiff submitted the grievance to the red-haired employee. *Id.* at 83-84. He described his earlier testimony as a mistake. *Id.* He also acknowledged that although he testified at the hearing that Lieutenant Reed had thrown the torn-up pieces of paper on the floor, where they were swept up by a Porter and placed in the trash before Plaintiff could get them, he testified at his deposition that after Lieutenant Reed tore up the paper, she stuck the pieces of paper in her pocket and that Plaintiff remembered seeing some pieces, maybe a crumb, hitting the floor. *Id.* at 85-86. He did not recall that testimony but acknowledged

7

that it was in the transcript and that he did not correct it despite having the opportunity to do so. *Id.* at 86-88.

Mr. Siler testified that at some point after this case was filed, he was asked to collect all inmate grievances submitted by Plaintiff. *Id.* at 30. He collected all of the grievances that were in the computer. *Id.* He also went through the boxes for the years Plaintiff was incarcerated, on all the floors where Plaintiff had been housed, looking through the hard copies to make sure that there were not any grievances that had not made it into the computer. *Id.* He also had a second person check for grievances. *Id.* at 31. He is confident that he retrieved all the grievances he had for Plaintiff. *Id.* The grievances filed by Plaintiff are collected in a document that has been filed as an exhibit in this case. *Id.* at 31-32; Def. Gonzalez Ex. 2, Doc. 116-2 ("Packet of Grievances"). However, no grievances were found concerning an allegation of force used against Plaintiff from June 11, 2017; no appeals from Mr. Walther were found concerning any incident from June 11, 2017; and no grievances were found about any behavior of Officer Habtemariam, William Trachsel, Lieutenant Reed, or Nurse Gonzalez from June 11, 2017. Id. at 33. There was a June 8, 2017 grievance regarding a medical issue. Hrg. Tr. at 33-34; Packet of Grievances at 7. There was an August 2017 grievance, but it was not about an incident in June 2017. Hrg. Tr. at 34; Packet of Grievances at 10.

Mr. Siler testified that if Plaintiff had handed a grievance to a different staff member and it got destroyed or did not make it into the mailbox, Mr. Siler would not have known about it. Hrg. Tr. at 39-40. However, he also testified that he had no reason to believe that Mr. Walther filed a grievance in June 2017 that would have been destroyed. *Id.* at 36.

Defendant Lieutenant Reed also testified at the hearing. *Id.* at 49-50. She testified that individuals sometimes gave her grievances, which she turned in to the unit manager's mailbox. *Id.*

at 51. She sometimes read them to determine whether there was a safety issue that might need to be addressed immediately. *Id.* She testified that after her encounter with Plaintiff, Plaintiff did not ever hand her a grievance; that Plaintiff did not give her a grievance between June 11th and June 12th, 2017; that she did not recall anyone talking about a grievance involving Plaintiff; that no one told her that Plaintiff had tried to file a grievance about her; that she never discouraged or prevented Plaintiff from filing a grievance; that she has never ripped up or destroyed a grievance from Plaintiff; and that she has never destroyed an inmate grievance. *Id.* at 54-55.

## IV. DISCUSSION

After carefully considering the documentary and testimonial evidence submitted by the parties, I find that Defendant has carried its burden of proving, by a preponderance of the evidence, that there was an administrative remedy available to Plaintiff with regard to the June 2017 incident and Plaintiff did not exhaust that remedy.

First, I find Defendants have proven that as a general matter, the Justice Center had, at the relevant time, administrative remedies that were available to its inmates, including Plaintiff. The uncontroverted testimony from Plaintiff and Mr. Siler demonstrates that inmates were given a copy of the Handbook, which describes a simple procedure for obtaining grievances forms, filling them out, delivering them to staff members, and appealing unsatisfactory responses. Mr. Siler also credibly testified as to the manner in which inmate grievances are delivered to a mailbox outside his door, entered into the computer by Mr. Siler, and responded to by the appropriate staff members. Plaintiff acknowledged that he personally understood how to use the grievance process and in fact used it and received responses on several occasions, both before and after the incident at issue here. Moreover, the documentary evidence shows that grievances Plaintiff filed related to matters other than the June 2017 incident were handled and responded to in a manner generally

9

consistent with Mr. Siler's testimony. There is no evidence to suggest that either this procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates" or that it is "so opaque as to be practically incapable of use." *See Muhammed*, 993 F.3d at 1000

Second, I find that Plaintiff did not exhaust these administrative remedies with regard to the June 2017 incident. Mr. Siler thoroughly explained the steps he took to ensure that he had copies of all of the grievances Plaintiff submitted while he was at the Justice Center, including searching the computer system and boxes of grievance files on each of the floors and units where Plaintiff resided and having a colleague conduct a second review. The collection of grievances contains no grievances from Plaintiff related to the June 2017 incident. It is also undisputed that Plaintiff filed no appeals related to the incident. Plaintiff thus did not exhaust the administrative remedies in place at the Justice Center.

The Court next considers the evidence that Plaintiff has put forward to suggest that there was "something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino,* 747 F.3d at 1172. Plaintiff he argues that he did everything he could to exhaust administrative remedies, pointing to his testimony that he filled out three grievances relevant to the incident and handed them to staff members on three separate occasions, but that he never received responses. He suggests that these grievances may never have been placed in Mr. Siler's mailbox at all or may have been removed from the unlocked mailbox before being processed. Plaintiff also points to his testimony that on one occasion, he saw Lieutenant Reed tear up a folded piece of paper (possibly his grievance) and said, "You think anybody cares about this?" Plaintiff further points out that because he never received a response to any of his grievances, he could not file an appeal and thus could not fully exhaust the

10

administrative remedies described in the Handbook.

Plaintiff's testimony, if fully credited, would suggest that Plaintiff did everything he could do to exhaust administrative remedies, but that he was prevented from exhausting those remedies by Justice Center staff members who either failed to deliver his grievances or destroyed them before they could be processed. That would certainly be a situation in which administrative remedies were unavailable, and thus need not be exhausted, because "administrators thwart[ed] inmates from taking advantage of a grievance process through machination" *Muhammed*, 933 F.3d at 1000, because "officials . . . prevented prisoners from utilizing the procedures," and/or because "officials themselves . . . failed to comply with the grievance procedures." *Gibson*, 431 F.3d at 341. *See also Miller v. Norris*, 247 F.3d 736, 738-40 (8th Cir. 2001) (finding that an inmate's allegations that his requests for grievance forms were never responded to raised an inference that he was prevented from utilizing the prison's administrative remedies). However, the Court does not find Plaintiff's testimony fully credible, for several reasons.

First, the Court simply finds the version of events suggested by Plaintiff to be implausible. It is certainly *possible* that on three separate occasions, three different grievance forms submitted to three different Justice Center staff members by Plaintiff were destroyed, stolen, or otherwise misplaced before they made it to Mr. Siler for processing. But the Court finds it unlikely. In particular, the Court finds it unlikely that that the caseworker, Ms. Stearns, having asked Plaintiff if he wanted to file a grievance, would have had a reason to subsequently thwart Plaintiff's effort to file the grievance by not delivering it to Mr. Siler for processing. Plaintiff's testimony about the grievance delivered to Ms. Stearns is also implausible because there was no evidence suggesting that any of the officers or nurses involved in the incident knew or could have known about the grievance form Plaintiff claims he gave to Ms. Stearns. Second, there was no evidence of anything

11

similar having occurred with any other grievances submitted by Plaintiff or other inmates. Third, the admitted discrepancies between Plaintiff's hearing testimony and deposition testimony cast some doubt on Plaintiff's account of the events surrounding his submission of grievances and Lieutenant Reed's tearing up of a paper in front of him. Finally, the Court gives weight to Mr. Siler's testimony that he had no reason to believe that any grievance filed by Plaintiff would be destroyed.

In sum, the Court finds, by a preponderance of the evidence, that although an administrative remedy was available to Plaintiff with regard to the June 2017 incident, Plaintiff did not submit any grievance forms with regard to that incident and thus did not exhaust his available administrative remedies. Accordingly, the Court must dismiss his claims.

V. **CONCLUSION**

For all of the above reasons,

**IT IS HEREBY ORDERED** that all of Plaintiff's claims are **DISMISSED**, without prejudice. A separate Order of Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that the jury trial setting on Monday, August 8, 2022, is **VACATED**.

                                                                         _____
                                                                         SHIRLEY PADMORE MENSAH
                                                                         UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of July, 2022.